Filed 1/11/24  P. v. Tessmer CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT HENRY TESSMER, JR.,<br><br>        Defendant and Appellant. | C095868<br><br>(Super. Ct. No. SCCRCRF20191989) |

Defendant Robert Henry Tessmer, Jr., beat an elderly acquaintance to death using his fists and a piece of firewood.  A jury found him guilty of first degree murder and elder abuse resulting in death and found true allegations that he personally used a dangerous and deadly weapon in committing elder abuse, and proximately caused the death of a person 70 years old or older.  In a bifurcated proceeding, the trial court found true allegations that defendant had a prior serious felony conviction and a prior strike conviction.  The trial court sentenced defendant to 50 years to life plus five years in state prison.

1

Defendant appeals, arguing: (1) there was insufficient evidence of premeditation and deliberation to support the jury's finding that he committed first degree murder; (2) the trial court erred by not instructing the jury on the meaning of "provocation" in the context of second degree murder; (3) his trial counsel rendered ineffective assistance by failing to request clarifying instructions on the meaning of "provocation" in the context of second degree murder; (4) the trial court's sentence on the elder abuse count violates section 1170, as amended by Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567); and (5) remand is required for the trial court to exercise its discretion as to which counts to stay pursuant to section 654, as amended by Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Assembly Bill 518). We will reject these contentions and affirm.

## I. BACKGROUND

Donald Hobrecht, age 70, lived alone in a small house in Siskiyou County. He was a private person and mostly kept to himself; however, he regularly spoke by phone with Michael, a friend from the Bay Area, and neighbors were generally aware of his comings and goings.

Defendant, age 37, had known Hobrecht for nearly 30 years, having lived across the street from him as a child. Over the years, defendant started using drugs and had frequent run ins with the law. He had a volatile temper and often found himself in physical altercations. By September 2019, defendant was homeless and living with his girlfriend in a Motel 6. He was also on parole.

Hobrecht liked defendant in spite of his difficulties. Hobrecht tried to help defendant by hiring him to perform yard work and odd jobs around the house. These efforts did not always go to plan. During their regular telephone conversations, Hobrecht complained to Michael that defendant was unreliable and rarely followed through on things he promised to do. He also told Michael that he sometimes felt unsafe around defendant due to his temper. When Michael asked whether he would ever consider

2

allowing defendant to stay with him, Hobrecht responded he would not feel safe with defendant living in the house.

Hobrecht and Michael spoke by phone as usual on the afternoon of September 17, 2019. It was a short conversation, which ended when defendant appeared at Hobrecht's house. Hobrecht asked Michael to call him back later, and Michael agreed to do so.

A. *Hobrecht Disappears*

Michael called Hobrecht on the evening of September 17, 2019. Hobrecht did not answer the phone. Michael called back six or seven times over the next couple of days and continued calling two or three times a day for the next two weeks. Sometimes Michael's calls went to an answering machine, sometimes they did not. Michael grew increasingly concerned and suspicious.

In the meantime, neighbors were starting to have suspicions of their own. One neighbor saw defendant and his girlfriend standing outside Hobrecht's house with three black trash bags. The neighbor watched as defendant spoke with Hobrecht and the men walked together towards the back of the house. He never saw Hobrecht again. But the neighbor saw defendant at Hobrecht's house almost every day. He also saw people coming and going from the house and removing furniture and other items.

Several neighbors saw defendant driving Hobrecht's car and truck. Another neighbor heard Hobrecht's car backing out of the driveway after 9:00 p.m., which was unusual, as Hobrecht was not one to leave the house at night. Still another neighbor noticed defendant and his girlfriend were living in Hobrecht's house and "taking over his life," while Hobrecht was "nowhere to be seen." Eventually, neighbors became concerned enough to call the sheriff's department. Michael had also called the sheriff's department.

B. *Welfare Checks and Calls to Dispatch*

The sheriff's department conducted a series of welfare checks on Hobrecht between late September and early October 2019. Sheriff's deputies went to Hobrecht's

house on September 26 and 27, 2019, and spoke with defendant and his girlfriend, each of whom said Hobrecht was visiting a friend in Yreka.  The sheriff's department then received a call from a person purporting to be Hobrecht.  The caller said he was fine and staying at a friend's house.

Sheriff's lieutenant Ben Whetstine conducted a welfare check on Hobrecht on October 1, 2019.  Defendant and his girlfriend answered the door.  Defendant told Whetstine that he was housesitting for Hobrecht, who was on a fishing trip in Oregon, and expected to return on October 2 or 3, 2019.

Lieutenant Whetstine conducted another welfare check on October 3, 2019.  This time, defendant said Hobrecht had decided to extend his fishing trip.  Defendant also said Hobrecht was becoming annoyed by the welfare checks, since he was a grown man and could do as he pleased.

Lieutenant Whetstine returned for yet another welfare check on October 4, 2019.  No one answered the door, so he walked around the property towards the backyard.  There, he found a pile of freshly turned dirt, about six feet long and two to three feet wide.  Whetstine called sheriff's detectives.

On October 5, 2019, the sheriff's department received another call from a person purporting to be Hobrecht.  The caller said he was fishing in Oregon and trying to enjoy himself.  He said he was okay, and there was no reason for sheriff's deputies to continue bothering his "tenant."

C.    *Investigation and Interviews*

Detective James Randall reviewed audio recordings of the calls from the person purporting to be Hobrecht.[1]  He noticed the caller sounded younger than 70 and seemed to have difficulty pronouncing the name "Hobrecht."  He compared the audio recordings

---

[1] The recordings were later played for the jury.

to recordings of jail calls made by defendant and determined the voices were the same or similar. He then determined the calls were placed by means of an application called "TextNow," using a number that was registered to defendant.

Sheriff's deputies and detectives executed a search warrant on Hobrecht's property on October 10, 2019. They found change of address confirmations from the United States Postal Service showing Hobrecht's address for defendant and his girlfriend. They also found a body in the backyard.

Defendant was detained in a patrol car, where he made a series of statements to investigating detectives.[2] Defendant initially claimed Hobrecht had returned from his fishing trip and left again for some "alone time." However, he admitted calling the sheriff's department and pretending to be Hobrecht. After the body was found, defendant admitted beating Hobrecht to death (or "put[ting] him down") with his hands and a piece of firewood. When asked whether his girlfriend was involved in Hobrecht's death, defendant replied, "She wasn't even here."

Defendant was arrested and taken to the sheriff's department, where he made another, more detailed statement. He explained that he had been working in Hobrecht's yard. He went inside for a snack, and Hobrecht started an argument about the way he was trimming some plants. According to defendant, Hobrecht "took a swing at me, basically." Defendant said Hobrecht had done this sort of thing before, and defendant had not made an issue of it. But this time, defendant said, he "just fucking took it kind of offensive." He remembered thinking, " 'Man, this old motherfucker took a swing at me,' you know. I'm thinking, 'fuck that. I ain't taking this shit.' "

Defendant then hit Hobrecht "square in the mouth." The older man fell to the floor. Defendant straddled Hobrecht and hit him eight or nine times in the head and

---

[2] Recordings of the statements were played for the jury.

5

ribcage. Defendant recalled that Hobrecht was "wiggling around" and "trying to dodge the punches and shit." When he was "already halfway through doing it," defendant thought, " 'Fuck. What am I going to do?' " "You know," he told detectives, "I figured fucking I already had him half beat. I figured I'll finish him off and bury him. No one will fucking know." Defendant then grabbed a piece of firewood and "smack[ed] him in the head with it to make sure he[ was] dead." Defendant said he threw the firewood, which he described as 16 inches long and four inches wide, "to make sure he was fucking all the way out. You know, finished off." When asked how much time elapsed between the eight or nine punches with defendant's fists and the blow to the head with the piece of firewood, defendant replied, "It wasn't that fucking long. Long enough for me to run over there and grab it and hit him with it."[3]

Defendant waited until nightfall to wrap Hobrecht's body in a blanket and drag him into the backyard. He then buried the body in a hole he had already started digging as part of his yardwork. He cleaned some blood from the floor using tissues, but there was not very much blood to clean—"It wasn't like a horror scene or nothing." Defendant opined the blow to the head with the piece of firewood was "probably" what killed Hobrecht. As defendant put it, Hobrecht, "w[as]n't moving. I figured he was done."

D.    *Charges and Jury Trial*

Defendant was charged by second amended information with premeditated murder (Pen. Code, § 187, subd. (a)—count 1)[4] and elder abuse resulting in death (§ 368, subd. (b)(1)—count 2). It was alleged as to both counts that defendant had personally used a deadly and dangerous weapon (the firewood) (§ 12022, subd. (b)(1)), and as to count 2, that defendant had proximately caused the death of the 70-year-old victim (§ 368, subd.

---

[3] The record does not disclose the distance from the attack to the place where firewood was stored.

[4] Undesignated statutory references are to the Penal Code.

(b)(3)).[5]  The second amended information also alleged that defendant had prior strike and serious felony convictions.  (§§ 1170.12, subds. (a)-(d), 667, subd. (a)(1).)  Defendant pled not guilty and denied the allegations.

The matter was tried to a jury in December 2021 and January 2022.  The prosecution's witnesses testified substantially as described *ante*.  The prosecution also presented evidence that defendant broke into Hobrecht's safe, spent money he found in Hobrecht's house, and called the Department of Health and Human Services as Hobrecht and requested a new electronic benefits transfer (EBT) card and pin number.  Defendant and his girlfriend also placed Hobrecht's belongings into trash bags and moved their own belongings into his drawers and closets.

The prosecution also offered the testimony of Dr. James Olson, a medical examiner and certified forensic pathologist.  Dr. Olson performed an autopsy on Hobrecht on October 11, 2019.  By then, Hobrecht had been dead for several weeks, and his body was in an advanced state of decomposition.  The brain was particularly decomposed; so much so that Dr. Olson was unable to draw definitive conclusions as to the mechanism of death.  All the same, Dr. Olson was able to form several opinions based on his observations and autopsy findings.

Dr. Olson observed a deep laceration above Hobrecht's left eyebrow, measuring approximately 1.5 inches.  Hobrecht's left ear was severely injured, "almost torn off."  Dr. Olson opined these injuries were caused by blunt force trauma, probably from a blow to the head with a heavy object.  He further opined that the injuries were consistent with defendant's account of having struck Hobrecht in the head with a piece of firewood.

Dr. Olson also observed areas of hemorrhage on the right side of Hobrecht's forehead, on his sternocleidomastoid muscle, and his lower ribcage.  Dr. Olson opined

[5] The trial court subsequently granted the prosecution's motion to dismiss the deadly weapon allegation as to count 1.  (§ 12022, subd. (b)(1).)

7

that these injuries occurred around the time of death and were consistent with blunt force trauma, "quite likely" from punching. These injuries, too, were consistent with defendant's account of the beating.

Dr. Olson also observed that Hobrecht suffered from preexisting heart conditions; namely, coronary artery disease and arthrosclerosis. Dr. Olson observed—and later confirmed—that Hobrecht had undergone coronary artery bypass surgery some years before.

Dr. Olson appeared to have little difficulty classifying Hobrecht's manner of death as a homicide. But the cause and mechanism of death were another story. Given the advanced decomposition of the brain, Dr. Olson could not say for certain that the cause of death was blunt force trauma to the head causing fatal brain injury. It was also possible—indeed, "quite likely"—that the stress of the assault triggered an arrythmia in a person with significant heart disease.[6]

Dr. Olson made several concessions on cross-examination. For one thing, he acknowledged that the cause of death may have been the multiple blows with defendant's fists, rather than the single blow with the piece of firewood. For another, he acknowledged that the absence of significant quantities of blood at the scene suggested Hobrecht may have already been dead when defendant struck him with the piece of firewood. In that case, Dr. Olson allowed, the laceration above Hobrecht's left eyebrow and avulsion of his left ear could have been caused by dragging the body to the burial site after death. However, he said, "you still have obvious blunt force and you have to be pretty rough in moving the body and striking objects."

Forensic pathologist Dr. Katherine Raven testified for the defense. Dr. Raven explained that she had reviewed Dr. Olson's autopsy findings and saw no evidence that

---

[6] A cardiac arrythmia is an electrical disturbance that causes the heart to stop beating and thus causes cardiac arrest.

any particular injury caused Hobrecht's death. [7] She opined the hemorrhage on the right side of Hobrecht's forehead was inflicted before death but was not sufficient to cause death. She added that there was no way to tell how the injury might have been inflicted. It could have been the result of a punch to the head, but it could also have been from knocking the head on the side of a sink (or presumably, any other inanimate object).

Dr. Raven further opined that the injuries to Hobrecht's ribs and neck area occurred around the same time, probably around the time of death. By contrast, Dr. Raven said it was possible that the laceration on the left side of Hobrecht's forehead and avulsion of the left ear were inflicted after death. According to Dr. Raven, these injuries would have produced substantial quantities of blood in a still-living victim, but very little blood was found at the scene or observed on Hobrecht's clothes or the blanket used to wrap his body. Consequently, Dr. Raven opined the injuries could have been caused by dragging or burying the body after death.

According to Dr. Raven, the mechanism of death could well have been arthrosclerosis and cardiac arrythmia. Thus, she said, there was nothing to contradict the theory that Hobrecht may have fallen and hit his head, then got up and fell again, and then died from the stress of having done so.[8]

On cross-examination, however, Dr. Raven acknowledged that she could not exclude the possibility that Hobrecht's death was the result of blunt force trauma causing

---

[7] Dr. Raven also testified that she would have liked to examine tissue samples, but Dr. Olson failed to collect any. Dr. Olson, for his part, said tissue samples would have been meaningless given the advanced state of decomposition of the body.

[8] Furthermore, Dr. Raven said, it was possible that Hobrecht could have been dead for as long as four weeks prior to the autopsy.

injury to the brain. She also agreed that the avulsion of Hobrecht's left ear would have been unlikely to have occurred from falling or being buried.

Dr. Olson testified again in rebuttal. He confirmed that the autopsy produced "evidence of blunt force [trauma] of the face and head in an individual with severe arthrosclerotic heart disease." As before, he could neither confirm nor exclude the possibility that the cause of death was significant brain injury given the severe decomposition of the brain. Thus, he opined the cause of death was either blunt force trauma from multiple blows to the head or blunt force trauma causing arrythmia due to arthrosclerosis.

Dr. Olson clarified that he believed the laceration on the left side of Hobrecht's forehead and avulsion to the left ear occurred either at the moment of death or immediately thereafter. Although Dr. Olson allowed that some of Hobrecht's injuries might have been consistent with falling (rather than an assault), the laceration on the left side of Hobrecht's forehead and avulsion to the left ear were not. Furthermore, Dr. Olson observed that Hobrecht's injuries suggested he would have had to have fallen more than once, and in more than one location. Thus, Dr. Olson opined that Hobrecht's injuries were not likely to have been caused by falling following a heart attack. Nevertheless, Dr. Olson acknowledged that Hobrecht could have died from sudden cardiac death.

In closing argument, the prosecutor framed the jury's decision as a choice between first and second degree murder. The prosecutor acknowledged that "it's a stronger second-degree murder case than it is first-degree murder." She urged the jury to focus on defendant's statements, particularly the statement that Hobrecht wiggled after defendant hit him. She suggested it did not matter whether the cause of death was blunt force trauma or blunt force trauma causing fatal cardiac arrythmia. Either way, the prosecutor argued, Hobrecht would not have died but for defendant's actions.

Defendant's trial counsel argued that all the evidence could be explained by the theory that Hobrecht died from cardiac arrythmia alone in his home and was found dead

10

by defendant sometime later.  Sensing an opportunity, defendant buried Hobrecht in the backyard and moved himself and his girlfriend into the dead man's house.  As for defendant's incriminating statements to law enforcement, trial counsel argued he was under the influence of drugs and lied to protect his girlfriend.

*E.      Verdict and Sentence*

On January 7, 2022, after approximately 2.5 hours of deliberations, the jury found defendant guilty on both counts and found the enhancements true as to count 2.  Defendant admitted the truth of the prior conviction allegation, and the trial court found true that the prior conviction constituted a strike and serious felony.

Defendant appeared for judgment and sentencing on March 1, 2022.  The trial court sentenced defendant to 50 years to life for the murder in count 1, plus five years for the prior serious felony enhancement.  The trial court imposed and stayed sentence on count 2, elder abuse (§ 368, subd. (b)(1)), as follows: eight years for the elder abuse offense (the upper term doubled) (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)), plus an enhancement of seven years for elder abuse resulting in death (§ 368, subd. (b)(3)), plus one year for the deadly weapon enhancement (§ 12022, subd. (b)(1)).

This appeal timely followed.

## II.  DISCUSSION

*A.      Evidence of Premeditation and Deliberation*

Defendant acknowledges the sufficiency of the evidence that he was responsible for Hobrecht's death, but argues the evidence was not sufficient to support the jury's finding that he acted with premeditation and deliberation.  At most, defendant says, the evidence shows he acted rashly, without any planning or motive to kill.  We disagree.

When considering a claim of insufficient evidence, we review " ' "the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a

11

reasonable doubt." ' " (*People v. Streeter* (2012) 54 Cal.4th 205, 241.)  We " 'must accept logical inferences that the jury might have drawn from the evidence even if [we] would have concluded otherwise.' " (*Ibid.*)  We do not reweigh the evidence or reevaluate the credibility of witnesses.  (*People v. Jones* (1990) 51 Cal.3d 294, 314.)

" 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.  If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " (*People v. Thomas* (1992) 2 Cal.4th 489, 514.) We may reverse a conviction for lack of substantial evidence only if it appears " ' "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).)  If the murder is "willful, deliberate, and premeditated," it is first degree murder.  (§ 189, subd. (a).)  " ' " 'In this context, "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " [Citation.]  " ' An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " [Citations.]  "The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " (*People v. Morales* (2020) 10 Cal.5th 76, 88.)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), our Supreme Court identified three categories of evidence that are typically sufficient to sustain a finding of

premeditation and deliberation: (1) planning evidence; (2) motive evidence; and (3) a manner of killing from which the jury could reasonably infer a deliberate intent to kill. (*Id.* at pp. 26-27.) These factors need not be present in "some special combination" or "accorded a particular weight" (*People v. Pride* (1992) 3 Cal.4th 195, 247), and "it is not essential that there be evidence of each category to sustain a conviction" (*People v. Gonzalez* (2012) 210 Cal.App.4th 875, 887). Rather, the factors are "simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than an unconsidered or rash impulse." (*People v. Pride, supra,* at p. 247.)

Defendant argues the prosecution failed to introduce evidence of planning, motive, and manner of killing sufficient to support a finding he committed the murder with premeditation and deliberation, rather than as a rash and unconsidered act. Again, the *Anderson* factors are not "a sine qua non to finding first degree premeditated murder, nor are they exclusive." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.) In any case, evidence of all three factors is present here.

We do not need to look far for evidence of planning. Defendant's statements to detectives suggest the beating took place in stages. According to defendant, the confrontation began when Hobrecht either "took a swing at [him]" or attempted to do so. Defendant became enraged and hit Hobrecht "square in the mouth." He then straddled Hobrecht and hit him eight or nine times in the head and ribcage. We will assume for argument's sake that defendant's actions up to this point were unplanned and spontaneous. What happened next, in defendant's telling, was not.

After describing the initial blows, defendant suggested there had been a break in the action in which he asked himself, " 'Fuck. What am I going to do?' " He recalled: "Thinking in my head. 'I'm going to jail. I'm going to do this, this, or this.' I just fucking did it. Figured fucking I'd get away with it and it didn't work." "You know," he continued, "I figured fucking I already had him half beat. I figured I'll finish him off and

bury him.  No one will fucking know."  He then retrieved a piece of firewood, presumably from somewhere else in the house.  He described looking down at Hobrecht before throwing the piece of firewood, saying, "I just—fuck, I looked at him before I threw the piece of log.  You know, I looked around, looked at him.  He's fucking down for the count.  I'm thinking, 'Fuck, he ain't coming out of this.'  So I had to—I just did it."  He then described throwing the piece of firewood "pretty hard"; arguably with enough force to produce a deep laceration on the left side of Hobrecht's forehead and an avulsion of his left ear.

These events appear to have unfolded in rapid succession.  As defendant told detectives, "It wasn't that fucking long.  Long enough for me to run over there and grab it and hit him with it."  But premeditation and deliberation may be formed in a very short span of time.  (*People v. Morales, supra,* 10 Cal.5th at p. 88 [" ' "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly" ' "]; see also *People v. San Nicolas* (2004) 34 Cal.4th 614, 658 ["The act of planning—involving deliberation and premeditation—requires nothing more than a 'successive thought[] of the mind' "]; and see *People v. Solomon*  (2010) 49 Cal.4th 792, 813 [a "preexisting reflection, of any duration," distinguishes first degree premeditated and deliberate murder from second degree murder].)  And here, though only seconds may have elapsed between the initial blows with defendant's fists and the final blow with the piece of firewood, defendant's own words show he considered the consequences of the initial beating ("I'm going to go to jail"), formulated a plan of action ("I'll finish him off and bury him"), and concluded he could get away with it ("No one will fucking know").  Even assuming the initial blows were unplanned, defendant's thought process, as he himself described it, shows he reflected on his actions as the attack was occurring, considered next steps, and deliberately chose to "finish [Hobrecht] off."  The jury could reasonably infer from defendant's statements that he engaged in planning activity after the attack began but before he retrieved the piece of firewood and struck the final blow.

14

(*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 493 ["what matters . . . is the extent of the defendant's reflection on his actions, not its duration]; see also *People v. Wright* (1985) 39 Cal.3d 576, 593, fn. 5 [obtaining a deadly weapon in advance of killing supports an inference of planning activity].)

We next consider the second *Anderson* factor, motive.  (*Anderson, supra,* 70 Cal.2d at pp. 26-27.)  Defendant acknowledges there was "some evidence" of motive, inasmuch as he "seized upon an opportunity to live in Hobrecht's home, spent what little money was in the home, and attempted to use Hobrecht's EBT card."  These things were not strong evidence of motive, defendant says, because Hobrecht was a man of modest means, and had very little to steal.  This argument misses the mark.  Defendant told detectives that "halfway through" the beating, he thought to himself:  " 'Fuck.  What am I going to do?' " and " ' I'm going to go to jail.' "  It was then, defendant said, that he "figured" he would "finish [Hobrecht] off and bury him."  On the record before us, the jury could reasonably believe that defendant, a parolee, was primarily motivated to "finish [Hobrecht] off" to avoid returning to prison.  There was substantial evidence of motive.

This brings us to the final *Anderson* factor, the manner of killing.  (*Anderson, supra,* 70 Cal.2d at pp. 26-27.)  Defendant argues the manner of killing, as suggested by Hobrecht's injuries, was consistent with a "sudden, violent explosion."  That is certainly one interpretation of the evidence, but it is not the only one.  As we have shown, the evidence also supports an inference that the killing "occurred in stages."  (*People v. Streeter, supra,* 54 Cal.4th at p. 244.)  Though the initial blows may have been spontaneous, the jury could reasonably conclude the final blow to the head—which was different in kind from the others—was calculated to ensure death, rather than an unconsidered "explosion" of violence.  Indeed, defendant said as much.  Thus, the manner of the killing, like the other *Anderson* factors, also supports an inference of deliberation and premeditation.

15

Defendant raises another challenge to the sufficiency of the evidence of premeditation and deliberation. He acknowledges that his statements to detectives amounted to evidence of premeditation and deliberation but observes that Dr. Olson and Dr. Raven each opined that Hobrecht may have already been dead when struck with the piece of firewood. In that case, defendant says, "he did not engage in premeditation and deliberation until *after* Hobrecht was dead." Again, this may be one way of looking at the evidence, but it is not the only way. Defendant told detectives he grabbed the piece of firewood to "finish [Hobrecht] off." He repeatedly and unequivocally said he thought Hobrecht died from the blow to the head with the piece of firewood, just as he evidently intended. The jury could reasonably credit defendant's firsthand account of what killed Hobrecht, while attributing Dr. Olsen's willingness to entertain other possibilities to the inconclusive state of the forensic evidence. Substantial evidence thus supports the jury's implicit finding that Hobrecht was alive, even if only barely, when defendant struck him with the piece of firewood.

Viewing the evidence in the light most favorable to the prosecution, as we must, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that the killing of Hobrecht was deliberate and premeditated. Our conclusion on this point also disposes of defendant's claim that the conviction violated his right to due process under the United States Constitution.

B.      *Jury Instructions on Provocation*

Defendant next challenges the trial court's jury instructions on provocation. He argues the instructions could have misled the jury into believing that provocation can reduce first degree murder to second degree murder only if the objective test is met; i.e., the provocation would have provoked a person of average disposition into a heat of passion. He asserts the trial court had a sua sponte duty to give an additional instruction explaining that provocation sufficient to reduce the killing to second degree murder is

16

measured by a subjective standard. In the alternative, he says his trial counsel was ineffective for failing to request such an instruction. We will reject these contentions.

### 1. *Additional Background*

Jurors were instructed with CALCRIM No. 520 that, if they decided that defendant committed murder, it was murder in the second degree unless the prosecution proved beyond a reasonable doubt that the murder was first degree murder as set forth in CALCRIM No. 521. The jury was instructed with CALCRIM No. 521 that defendant was guilty of first degree murder if he acted "willfully, deliberately, and with premeditation," and "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated."

The trial court gave two instructions regarding provocation. First, the trial court instructed the jury with CALCRIM No. 522 as follows: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

Second, the trial court instructed the jury with CALCRIM No. 570 that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed because of a sudden quarrel or in the heat of passion if: (1) the defendant was "provoked"; (2) "[a]s a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment"; and (3) "[t]he provocation would have caused a person of average disposition to act rashly or without due deliberation, that is, from passion rather than from judgment."

The jury was also instructed with CALCRIM No. 570 that: "It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own

17

standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment." As before, the jury was reminded that the prosecution has "the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion."

### 2. *Sua Sponte Duty to Instruct*

Defendant does not argue any of these instructions are incorrect statements of law. Instead, he argues their combined effect was to mislead the jury on an important point of law: that an objective test applies to provocation for purposes of reducing murder to voluntary manslaughter, while a subjective test applies for purposes of reducing malice murder from first to second degree. (See *People v. Padilla* (2002) 103 Cal.App.4th 675, 678 ["The test of whether provocation or heat of passion can negate malice so as to mitigate murder to voluntary manslaughter is objective. The test of whether provocation or heat of passion can negate deliberation and premeditation so as to reduce first degree murder to second degree murder, on the other hand, is subjective"].) Although he did not request it, defendant argues the trial court should have given an additional instruction clarifying that the provocation necessary to reduce first degree murder to second degree murder is judged by a subjective standard. These arguments fail.

CALCRIM No. 522 is a pinpoint instruction and, as such, need only be given upon request. (*People v. Rivera* (2019) 7 Cal.5th 306, 328; *People v. Hardy* (2018) 5 Cal.5th 56, 99 (*Hardy*).) It follows that additional instructions amplifying or clarifying CALCRIM No. 522 are also pinpoint instructions and need not be given sua sponte. (See *People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1333-1334 (*Hernandez*) ["[T]he fact that a trial court is not required to instruct on provocation for second degree murder *at all* supports that it is not misleading to instruct on provocation without explicitly stating that

18

provocation can negate premeditation and deliberation"].) Defendant's trial counsel requested and received CALCRIM No. 522; she did not request any additional instruction amplifying or clarifying "provocation."

Even when a trial court does not have a sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly. (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015; *Hernandez, supra,* 183 Cal.App.4th at pp. 1331-1332.) Furthermore, the trial court generally has a sua sponte duty to give amplifying or clarifying instructions " ' "where the terms used [in the instruction] have a technical meaning peculiar to the law." ' " (*People v. Richie* (1994) 28 Cal.App.4th 1347, 1360.) " ' "A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning." ' " (*People v. Cross* (2008) 45 Cal.4th 58, 68.) We independently review whether a jury instruction correctly states the law. (*People v. Bates* (2019) 35 Cal.App.5th 1, 9.)

We have little difficulty concluding the instructions given here correctly conveyed the law. As even defendant appears to recognize, several cases have so held. (See, e.g., *Hernandez, supra,* 183 Cal.App.4th at pp. 1333-1334; *People v. Jones* (2014) 223 Cal.App.4th 995, 1001 (*Jones*).) In *Hernandez,* for example, the defendant argued that "CALCRIM No. 522 is inadequate because it does not specifically inform the jury that provocation is relevant to determine whether the defendant killed without premeditation and deliberation." (*Hernandez, supra,* at p. 1333.) The court rejected the defendant's argument, stating: "Although CALCRIM No. 522 does not expressly state provocation is relevant to the issues of premeditation and deliberation, when the instructions are read as a whole there is no reasonable likelihood the jury did not understand this concept. Based on CALCRIM No. 521, the jury was instructed that unless the defendant acted with premeditation and deliberation, he is guilty of second, not first, degree murder, and that a rash, impulsive decision to kill is not deliberate and premeditated. Based on CALCRIM No. 522, the jury was instructed that provocation may reduce the murder to second

19

degree murder. [¶] In this context, provocation was not used in a technical sense peculiar to the law, and we assume the jurors were aware of the common meaning of the term. [Citation.] Provocation means 'something that provokes, arouses, or stimulates'; provoke means 'to arouse to a feeling or action[;] . . . to incite to anger.' [Citations.] Considering CALCRIM Nos. 521 and 522 together, the jurors would have understood that provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation." (*Id.* at p. 1334.)

In *Jones, supra,* as here, the jury was instructed with CALCRIM Nos. 520, 521, 522, and 570. (*Jones, supra,* 223 Cal.App.4th at p. 999.) The defendant argued the instructions "were misleading because they did not, or did not explicitly, inform the jury that the objective standard applies only for reduction of murder to voluntary manslaughter, and does not apply to reduce first to second degree murder." (*Ibid.*) Relying on *Hernandez,* the *Jones* court rejected the defendant's argument stating: "[T]he instructions are correct. They accurately inform the jury what is required for first degree murder, and that if the defendant's action was in fact the result of provocation, that level of crime was not committed. CALCRIM Nos. 521 and 522, taken together, informed jurors that 'provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation.' " (*Id.* at p. 1001.) So too here. Following *Hernandez* and *Jones,* we conclude the instructions as a whole accurately instructed the jury as to provocation for second degree murder and were not misleading.

Defendant tries to avoid this conclusion by arguing "provocation" has a technical meaning peculiar to the law which should have been defined sua sponte by the trial court. Not so. "A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning." (*People v. Estrada* (1995) 11 Cal.4th 568, 574.) "Provocation," as used here, "bore [its] common meaning, which required no further explanation in the absence of a specific request."

20

(*People v. Cole* (2004) 33 Cal.4th 1158, 1217-1218; see *Hernandez, supra,* 183 Cal.App.4th at p. 1334 ["Provocation means 'something that provokes, arouses, or stimulates'; provoke means 'to arouse to a feeling or action[;] . . . to incite to anger' "].) We reject defendant's claim of instructional error.

  *3.  Ineffective Assistance of Counsel*

  Defendant argues in the alternative that his trial counsel rendered ineffective assistance by failing to request clarifying instructions on provocation in the context of second degree murder. As previously discussed, no such instructions were necessary. In any case, defendant's ineffective assistance claim fails.

  To prevail on such a claim, defendant must establish "not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice. [Citation.] Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." (*People v. Bolin* (1998) 18 Cal.4th 297, 333.) "In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

  Here, defendant's trial counsel made a tactical decision to argue that defendant was not responsible for Hobrecht's death at all. Instead, she theorized that Hobrecht suffered a fatal arrythmia alone in his home and defendant happened upon the body sometime later. That theory, though unsuccessful, was not objectively unreasonable given the forensic evidence, and we cannot say defendant's trial counsel was deficient in failing to request an instruction that would have called attention to the possibility that defendant might have been present at the time of death after all. (See *Jones, supra,* 223 Cal.App.4th at p. 1002 [no deficient performance where counsel chose to focus on theory of mistaken identity rather than provocation].) Defendant has not established ineffective assistance of counsel.

*C.* *Sentencing Issues*

Defendant raises two sentencing issues. First, he argues the trial court's sentence on the elder abuse count violates section 1170, as amended by Senate Bill 567. Second, he argues remand is required for the trial court to exercise its discretion as to which counts to stay pursuant to section 654, as amended by Assembly Bill 518. We conclude both issues have been forfeited.

*1.* *Senate Bill 567*

Defendant argues the trial court violated section 1170, subdivision (b) in imposing the upper term sentence on count 2. He argues the trial court relied on aggravating factors that were not found true beyond a reasonable doubt and were not based on prior convictions established by a certified record of conviction. He urges us to vacate the sentence and remand for resentencing. We conclude defendant forfeited this claim by failing to object to the upper term sentence in the trial court.

Senate Bill 567 became effective January 1, 2022, two months before the sentencing hearing. (Stats. 2021, ch. 731; Cal. Const., art. IV, § 8, subd. (c).) As relevant here, Senate Bill 567 limits the trial court's ability to impose the upper term sentence except where there are circumstances in aggravation of the crime that justify imposition of the upper term, and the facts underlying those circumstances have been (1) stipulated to by the defendant, or (2) found true beyond a reasonable doubt at trial or by the judge in a court trial. (§ 1170, subd. (b)(1)-(2).) An exception to this rule authorizes the court to consider defendant's prior convictions in determining sentencing based on certified records of conviction without submitting the prior convictions to the jury. (§ 1170, subd. (b)(3).)

In imposing the upper term, the trail court relied on the probation department's recommendation and the following aggravating factors: (1) the victim was particularly

22

vulnerable (Cal. Rules of Court, rule 4.421(a)(3)),[9] (2) defendant engaged in violent conduct that indicated a serious danger to society (rule 4.421(b)(1)), (3) defendant's prior convictions as an adult were numerous or of increasing seriousness (rule 4.421(b)(2)), (4) defendant had served a prior term in prison (rule 4.421(b)(3)), (5) defendant was on parole when the crime was committed (rule 4.421(b)(4)), and (6) defendant's prior performance on parole was unsatisfactory (rule 4.421(b)(5)). The trial court found no factors in mitigation.

The jury, having found true the special allegation that defendant proximately caused the death of a victim 70 years of age or older (§ 368, subd. (b)(3)), implicitly found the first aggravating factor true beyond a reasonable doubt.[10] The trial court was therefore permitted to impose the upper term sentence. (See generally *People v. Black* (2007) 41 Cal.4th 799, 812-816 [a jury's finding of a single aggravating circumstance is sufficient to make a defendant eligible for an upper term sentence]; see also *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1110 ["if a trial court found true a single aggravating fact that it believed supported imposition of an upper term sentence, and if a jury necessarily would have found that same fact true had it considered the matter, then a reviewing court would not remand for resentencing simply to address this plainly harmless error].)

It is true, as defendant observes, that none of the other aggravating factors were found to have been true beyond a reasonable doubt. It is also true that defendant did not stipulate to any circumstances in aggravation, and no certified records appear to have been introduced at sentencing hearing. But defendant did not object to any of the trial court's findings of factors in aggravation, much less the court's decision to impose the

---

[9] References to rules are to the California Rules of Court.

[10] Defendant also admitted the prior strike conviction and prior serious felony conviction allegations.

upper term sentence on count 2.  As a result, the claim is forfeited.  (See *People v. Flowers* (2022) 81 Cal.App.5th 680, 683-684, review granted Oct. 12, 2022, S276237 [defendant's argument trial court relied on improper factors in imposing upper term sentence were forfeited where defendant failed to object in the trial court]; see also *People v. Scott* (1994) 9 Cal.4th 331, 353 ["waiver doctrine should apply to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices"].)

        2.      *Assembly Bill 518*

Finally, defendant argues remand for resentencing is required to allow the trial court to stay the sentence on either count 1 or count 2 in accordance with section 654, as amended by Assembly Bill 518.  This claim has also been forfeited.

Section 654, former subdivision (a) provided, in pertinent part:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment."  Effective January 1, 2022, as amended by Assembly Bill 518, section 654, subdivision (a) now provides, in pertinent part:  "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions."  (Stats. 2021, ch. 441, § 1.)

Defendant was sentenced on March 1, 2022, two months after Assembly Bill 518 became effective.  Defendant could have objected and argued for an alternative sentence under the newly amended section 654, such as imposing the shorter sentence on count 2 and staying the longer sentence on count 1.  For whatever reason, he failed to do so.  The claim is thus forfeited.  (*People v. Scott, supra,* 9 Cal.4th at p. 353.)

## III. DISPOSITION

The judgment is affirmed.

/S/

RENNER, J.

We concur:

/S/

MAURO, Acting P. J.

/S/

MESIWALA, J.